UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BILLINGNETWORK PATENT, INC.,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>ELECTRONIC NETWORK SYSTEMS, INC.<br>and INGENIX, INC.,<br><br>　　　　Defendants. | No. 09 cv 4690<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Billingnetwork Patent, Inc. ("BNP") accuses Defendants Electronic Network Systems, Inc. ("ENS") and Ingenix, Inc. ("Ingenix") of infringing United States Patent No. 6,674,229 ("'229 Patent"). On July 30, 2012, the Court conducted a hearing during which it heard evidence and argument regarding the construction of four different terms contained in Claim 1 of the '229 Patent. The Court's construction of these terms is set forth below.

### I.   BACKGROUND

Plaintiff filed its application for the '229 Patent on October 20, 1999 and the U.S. Patent and Trademark Office (PTO) issued it on April 16, 2002. The '229 Patent discloses a browser-based system that allows business operators to input and receive party billing information in real-time by the use of a browser and which also performs the billing function of producing itemized bills to responsible parties. BNP is the current assignee of the patent.[1] Claim 1 of the

---

[1] Plaintiff has been involved in three previous litigations involving infringement of the '229 Patent and the construction of claims terms. On May 14, 2003, BNP's predecessor in interest, Billingnetwork.com, filed a complaint in the United States District Court for the Middle District of Florida against Advanced Healthcare Billing, Inc., asserting infringement Claim 1 of the '229 Patent. *Billingnetwork.com v. Advanced Healthcare Billing, Inc.*, No. 8:03-cv-927. In the context of a preliminary injunction hearing, the court construed the term "real time." Ultimately, the case settled and did not proceed to final judgment.
　　On March 22, 2006, NDCHealth Corp. filed a declaratory judgment action in the United States District Court for the Northern District of Georgia against BNP, for a declaration that NDCHealth did not infringe Claim 1.

1

'229 Patent, which is the only claim at issue here, reads as follows (disputed terms are in bold):

> An integrated internet facilitated billing, data processing, and communication system comprising:
>
> a database server and a home page of a website which provides access via an internet service provider (ISP) to said database server by a plurality of browser-based subscribers each of which have electronic access to said home page via a **modem** and the ISP;
>
> said home page providing only secure access by each browser-based subscriber to one of a plurality of subscriber areas within said system;
>
> means for providing electronic transfer of **substantially only** billing and data entry forms to the browser-based subscriber upon request, data entered on said forms, when electronically returned to a corresponding said subscriber area, then entered into said database server;
>
> said database server then, utilizing an appropriate application software thereon, **producing billing invoices and statements to clients and customers for each corresponding browser-based subscriber**;
>
> mean for providing **real time** electronic viewing and query access of data and billing stored in said database server by each corresponding browser-based subscriber;
>
> a PC type computer electronically connected to said database server for controlling said forms as required and responding to queries entered by each browser based subscriber.

## II. THE LAW OF CLAIM CONSTRUCTION

### A. Generally

A patent infringement analysis involves two steps. The first step, claim construction, is a determination of the meaning and scope of the asserted patent claims. Claim construction is a

---

*NDCHealth Corp., et al. v. BillingNetwork Inc.*, No. 1:06-cv-0666. On November 21, 2006, the parties submitted to the court a Joint Claim Construction Statement as required pursuant to local rule. The NDCHealth Stipulation included three of the four claim terms at issue in this case: "real time," "producing billing invoices and statements to clients and customers," and "substantially only." "Modem" was not construed nor agreed to in the NDCHealth litigation. The case eventually settled and did not proceed to final judgment.

    On June 28, 2004, BNP filed a lawsuit in the United States District Court for the Middle District of Florida against Cerner Physicians Practice, Inc., asserting infringement of Claim 1. *BillingNetwork Patent, Inc. v. Cerner Physician Practice, Inc. et al.*, No. 8:04-cv-1515. The court in that case issued a claim construction order that adopted the "real time" construction that BNP stipulated to in the NDCHealth litigation. The Cerner case settled and did not proceed to final judgment.

matter of law for the court, subject to *de novo* review on appeal. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (*en banc* ), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The second step is for the trier of fact to determine whether the accused product or method falls within the scope of the properly construed claims. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1467 (Fed. Cir. 1998) (en banc). Claim construction is to be based primarily on the "intrinsic evidence" of the patent (in order of importance): the claim language, the patent specification,[2] and the prosecution history[3] of the patent. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed Cir. 2005) (en banc).

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312. *See also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005) ("In construing claims the analytical focus must begin and remain centered on the language of the claims themselves…"). The words in a claim usually carry their "ordinary and customary meaning," which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application" in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent" in light of the specification, prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art. *Id.* at 1332;

---

[2] 35 U.S.C. § 112, ¶ 1 provides that, every patent must have a specification containing "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

[3] The prosecution history, also referred to as the file history, is the record of the correspondence between the applicant and the U.S. Patent and Trademark Office during the patent application process. The prosecution history becomes public record upon issuance of the patent.

*Phillips*, 415 F.3d at 1313; *Markman*, 517 U.S. at 370.[4]

In addition to the claim language, the specification is "always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (citing *Vitronics*, 90 F.3d at 1582) (internal quotation marks omitted).

The claim language need not necessarily have a customary and ordinary meaning because a patentee may act (at his considerable peril) as his own "lexicographer" and give words special meaning by clearly defining a patent term in the specification or prosecution history. *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1382 (Fed. Cir. 2011). The specification itself may also reveal an intentional disclaimer, or disavowal, of claim scope by the inventor, in which case, "the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1316. *See also Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (holding that despite the absence of the word "play" in floor panel patent claims, the claimed invention must have included a play limitation because the claim language recited floor system features in which a play limitation was necessarily present, the specification read as a whole led to the "inescapable conclusion" of a play limitation, and the "specification also distinguished the prior art on the basis of play").

Courts are cautioned against reading an inappropriate limitation from the specification into the claims. *Phillips*, 415 F.3d at 1320 ("one of the cardinal sins of patent law"). *See also Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir.

---

[4] "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. For example, *Texas Digital Systems, Inc. v. Telegenix, Inc.*, suggested greater emphasis on dictionary definitions of claim terms and assigned a less prominent role to the specification and the prosecution history. *Phillips*, 415 F.3d at 1319 (referencing *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193 (Fed.Cir.2002)).

2011) ("There is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims . . . In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention.") (internal citation omitted); *Kara Tech., Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

Beyond the specification a court may consider, if in evidence, a patent's prosecution history—the "undisputed public record" of proceedings in the Patent and Trademark Office—to ascertain the true meaning of patent claim language. *Markman*, 52 F.3d at 980. "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. *See also Inverness Med. Switz. GmbH v. Warner Lambert Co.,* 309 F.3d 1373, 1380-82 (Fed.Cir.2002) (ambiguity of prosecution history made it less relevant to claim construction). "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. *See also Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324 (Fed. Cir. 2002) ("Although prosecution history can be a useful tool for interpreting claim terms, it cannot be used to limit the scope of a claim unless the applicant took a position before

the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter.").

Only when ambiguity remains after consulting the intrinsic evidence may the court resort to "extrinsic" evidence external to the claim language and file history to construe the claim terms. *See generally Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008); *LB Plastics, Inc. v. Amerimax Home Prods., Inc.*, 499 F.3d 1303, 1308 (Fed. Cir. 2007). Dictionaries, treatises, and inventor testimony, extrinsic evidence such as reasoned and well supported expert testimony may be useful to provide background on the technology, explain how the invention works, or to establish that a particular term in the patent has a particular meaning in the pertinent art. *Phillips*, 415 F.3d at 1317-18.

### III. CLAIM CONSTRUCTION ANALYSIS

#### A. Collateral Estoppel

Before construing the disputed terms in Claim 1, I address Defendants' argument that Plaintiff is collaterally estopped from proposing different term constructions than those it stipulated to in *NDCHealth* and which the *Cerner* court adopted. The law of the regional circuit applies to the issue of collateral estoppel, and the party seeking to invoke the doctrine bears the burden of proving all necessary elements. *RF Deleware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1261 (Fed. Cir. 2003). In the Seventh Circuit, issue preclusion is appropriate if: (1) the issue sought to be litigated is identical to one decided in a prior action; (2) that issue was actually litigated in the first action; (3) the determination of the issue was essential to the final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action. *See Abbott Laboratories v. Dey, L.P.*, 110 F.Supp.2d 667, 670 (N.D. Ill. 2000). Here, unlike in *Abbott Labs*, no final judgment

was reached in the previous related infringement suits so collateral estoppel does not apply.

### B. Claim Construction

1. *Producing billing invoices and statements to clients and customers*

Plaintiff argues that *producing billing invoices and statements to clients and customers* should be construed as "producing itemized bills for good or services to the party (a person or company) being billed." In other words, Plaintiff argues that "invoice" and "statements" should be interpreted as interchangeable, and so too should "clients" and "customers." Defendants, on the other hand, assert that this phrase requires four specific types of output: (1) billing invoices to clients; (2) billing invoices to customers; (3) statements to clients; and (4) statements to customers.

I agree with Plaintiff's construction. Words of a claim are generally given their ordinary and customary meaning, *Phillips*, 415 F.3d at 1312-13, and there can be no real dispute that, in ordinary usage, "invoice" and "statements," as well as "clients" and "customers" are synonymous. The question then becomes whether intrinsic evidence demonstrates that these terms have distinctive meaning in the context of the disputed claim. There is no such evidence. The terms are never defined within the claim or specification, and they are used interchangeably throughout the specification. Thus, there is no intrinsic evidence that Plaintiff intended to act as its own lexicographer by giving otherwise synonymous terms distinctive meaning.

Defendants point to two pieces of extrinsic evidence to reinforce its position. First, Dr. Krumholz's deposition testimony, in which he states that the "customer" is the patient and the "client" is the third party payer. I have no doubt that this is what Dr. Krumholz envisioned when he submitted the '229 Patent for approval. The problem for Defendants is that in determining the scope of a claim, the inventor's subjective intent is irrelevant. *Howmedica Osteonics Corp.*

7

*v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008). While the need of the medical industry may have been what mothered the '229 Patent, nothing in the claim language limits its application to billing for medical services and Defendants' proposed restrictions simply do not make sense when the invention is applied to other fields.

Second, Defendants point to the *Cerner* claim construction. As I have already found, I am not bound by this order. More to the point, I disagree with Defendants' interpretation of it. I read the *Cerner* court's adoption of Defendants' now proposed language as having been primarily based upon the "plain language of the claim," rather than evidence from the prosecution history. (Def's Ex. 3 at 24). As I have explained, I believe the plain language of the claim points toward Plaintiff's construction.

It is true that in adopting Plaintiff's proposed construction, I am effectively rendering both "statements" and "customers" superfluous—"a methodology of claim construction [the Federal Circuit] has denounced." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007). The problem is I have no basis for assigning distinctive meaning to these terms other than Dr. Krumholz's testimony, which is a clearly invalid basis. Here, rendering certain terms superfluous rather than importing limitations that run contrary to the terms' ordinary meanings and find no support in the intrinsic evidence is the lesser of two evils.

The Court construes the phrase "producing billing invoices and statements to clients and customers" to mean "producing itemized bills for goods or services to the party (a person or company) being billed."

    2.    *Substantially only*

Plaintiff argues that *substantially only* should be construed as "at least billing and data entry forms and not any underlying software application." Defendant argues that *substantially*

*only* should simply be construed as "only." I reject both constructions.

As to Plaintiff's proposal, interpreting "substantially only" to mean "at least" could give broadly expansive effect to language that is clearly meant to circumscribe Claim 1's coverage of other things electronically transferred along with billing and data entry forms. On the other hand, I refuse to read out "substantially" altogether. *See Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005).

Given the technological complexity of the subject matter at issue I am reluctant to impose my own construction. The parties are ordered to submit new claim proposals for *substantially only*. The new interpretations should reflect that the adverb "substantially" operates both in concert with (by limiting the general universe of things electronically transferred) and contrast to (by allowing *some* things other than billing and data entry forms) the adverb "only."

3. *Real Time*

Plaintiff argues that *real time* should be construed as "without perceived delay." Defendants argue *real time* should be construed as "instantaneous." I agree with Plaintiff that Defendants' proposed construction is based on an improper importation of a limitation from the specification into the claims. *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008). The word "instantaneous" does not appear in the claim itself and only once appears in an embodiment described in specification. Nothing in the specification suggests that the patentee intended for the claims to be "strictly coextensive" with this single embodiment. *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607, F.3d 784, 792 (Fed. Cir. 2010).

The extrinsic evidence from the time of the filing of the '229 Patent supports Plaintiff's construction. The *Dictionary of Computing & Digital Media* (1999) defines "real time" as "[t]he

9

time during which a data processing event occurs. Data is received and processed so fast and the results are returned so quickly that the process seems instantaneous to the user." The use of the word '"seems" is critical—it is an acknowledgement that Defendants' proposed construction constitutes a physical impossibility.

This same concept was recently discussed by the Federal Circuit in *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075 (Fed. Cir. 2009) in the context of two separate units receiving electronic signals from one another:

> [W]hen the claimed system is in operation, the displayed data must first be acquired by the electronic positioning device and the physiological monitor and then transmitted to the display unit for display. Even assuming that this transmission happens at the speed of light, it still takes a non-zero amount of time. Thus, what the claims describe as "displaying real-time data" cannot possibly mean displaying data literally instantaneously, because the claims themselves require a transmission that necessarily takes some time, however minute that might be.

The same is true here. As such, the Court construes *real time* to mean "without perceived delay."

    4.    *Modem*

Plaintiff argues that *modem* should be construed as "a device that converts a digital signal into an analog signal suitable for transmission over an analog communication channel." Defendants argue it should be construed as "a communications device that both converts binary digital signals to analog signals for transmission over a telephone line and also that receives analog signals from a telephone line and reconverts the analog signal into a binary digital signal."

Defendants argue that *modem* should be limited to telephone lines because Claim 6, which covers "thin client technology," recites "transferring data via *phone modem* lines." While Defendants are generally correct that "the usage of a term in one claim can often illuminate the

10

meaning of the same term in other claims," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005), this cuts against their proposed construction. "The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id*. at 1315. Thus, the Court finds that presence of the "phone" limitation in Claim 6 actually supports Plaintiff's argument that *modem* should not be construed as so limited in Claim 1.

Plaintiff's construction is further supported by the fact that 1) there is nothing in the specification or prosecution history to suggest that "modem" was intended to be limited to devices operating via telephone lines alone, and 2) the extrinsic evidence suggests that a person of skill in the art at the time the patent was issued would not understand *modem* to be limited to telephone lines. For example, the Institute of Electrical and Electronics Engineers (IEEE) *Authoritative Dictionary of IEEE Standards Terms* (7th ed. 2000) defines *modem* as "an equipment that connects data terminal equipment to a communication line." "A communication line" is not limited to telephone lines under the IEEE's definition and without intrinsic evidence suggesting otherwise it should not be so limited here.

The Court construes *modem* to mean "a device that converts a digital signal suitable for transmission over an analog communication channel."

**IV.     THE COURT'S CONTSTRUCTION OF THE DISPUTED CLAIM TERMS**

The Court having considered all submission and the oral presentation of both sides, and been fully advised, IT IS HEREBY ORDERED as follows:

1. Claim 1 of the '229 Patent recites "producing billing invoices and statements to clients and customers." The Court interprets this claim element to mean "producing itemized bills for goods or services to the party (a person or company) being billed."

2. Claim 1 of the '229 Patent recites "substantially only." The Court rejects both sides' proposed constructions and orders the parties to submit new proposals that comport with this order.

3. Claim 1 of the '229 Patent recites "real time." The Court interprets this claim element to mean "without perceived delay."

4. Claim 1 of the '229 Patent recites "modem." The Court interprets this claim element to mean "a device that converts a digital signal suitable for transmission over an analog communication channel."

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: November 9, 2012